IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**FILED**

OCT 2 4 2008

DEBRA C. MELVIN,
        Plaintiff,

**U.S. DISTRICT COURT
CLARKSBURG, WV 26301**

v.

Civil Action No. 3:07CV148
(Chief Judge Bailey)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,
        Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1383f. The matter is awaiting decision on Plaintiff's Motion for Judgment on the Pleadings [Docket Entry 10], Defendant's Motion for Summary Judgment [Docket Entry 12], and Plaintiff's Memorandum in Opposition to Defendant's Motion for Judgment on the Pleadings [Docket Entry 13], and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. Procedural History

Debra C. Melvin ("Plaintiff") originally filed an application for SSI on April 6, 2004, alleging disability since January 9, 2004 (R. 55). Plaintiff included the statement: "as of February 13, 2004: I have not been accused or convicted of a felony . . . . I have not been accused or convicted of an attempt to commit a felony . . . . I am not on parole or probation under Federal or State law." An amendment to the application was apparently made on August 17, 2004 (but is not signed), stating:

> The following statements describe the fugitive felon/parole or probation violator status of DEBRA CAROL MELVIN as of February 13, 2004:

> From February 13, 2004 to: continuing:
>> I am fleeing to avoid:
>>> Trial on a criminal charge of a felony
>>> . . . or
>>> Jail or prison after conviction of a
>>> felony . . . or
>>> Custody after conviction of a felony
>> in the state of West Virginia.
>> I am not on parole or probation under Federal or State law.

(R. 61).

In her April 2004, application, Plaintiff alleged disability beginning January 9, 2004, due to Hepatitis C, depression, and anxiety (R. 70). There is no follow-up to this actual application– no initial determination or reconsideration in the record.

Plaintiff filed the present application for SSI on July 27, 2005, stating that from that date on she was not fleeing and had not violated a condition of her parole or probation imposed under Federal or State law (R. 59). The application was denied initially and on reconsideration (R. 45, 46). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Mark O'Hara held on February 27, 2007 (R. 310). Plaintiff, represented by counsel, testified on her own behalf, along with Vocational Expert Herbert Pearis ("VE"). By decision dated April 23, 2007, the ALJ denied benefits (R. 27). The Appeals Council denied Plaintiff's request for review on June 10, 2007, rendering the ALJ's decision the final decision of the Commissioner (R. 4-7).

## II. Statement of Facts

Debra C. Melvin ("Plaintiff ") was born on December 26, 1965, and was 41 years old at the time of the ALJ's decision (R. 55, 454). She went to school through the 8th grade and testified she did not obtain a GED (R. 327), although in her Disability Report she states she received her GED in 1999 (R. 76), and she told her case worker at Seneca Mental Health that she had a GED (R. 203).

She has worked in the past as a fast food cook/cashier, as a deli worker, as a hotel maid, and as a retail worker (R. 71). None of these jobs lasted longer than ten months, and she worked a total of 29 months between 1992 and 2004.

According to Plaintiff's testimony, she spent six months in jail for a DUI from about September 1999 until March 2000.[1] She then worked at Hardee's from April 2000 until July 2000. She explained at her hearing that she left the job at Hardee's to move to West Virginia. In her application she stated that her longest job was doing deli work (R. 71). Her description of this job, performed until at least September 2003, included: "Kept deli supplied, moved supplies, wrapped/sliced/priced food, cleaned deli, ran cash register" (R. 71).

On February 6, 2003, Plaintiff presented to the emergency room with complaints of puncture wounds to the abdomen. She stated that she had been stabbed with a boy scout knife. It was noted that she smelled strongly of alcohol. It was also noted that the puncture wounds on Plaintiff's abdomen were the "same size, shape and pattern of dog bite marks found on another E.R. pt. who was involved in altercation with this pt. and her dog." (R. 119). Plaintiff was given a tetanus shot and her mother was to transfer her to a different hospital. She was diagnosed with abnormal stab wounds and alcohol intoxication. Plaintiff was apparently working at the time, because she stated she worked from December 2002, until September 2003, at a deli. The record shows she earned over $7,000.00 in 2003. According to her application she worked at KMart from November 2003 until January 4, 2004, and "ran deli" from December 28, 2003, until February 9, 2004. Her alleged onset date is January 9, 2004 (R. 71).

---

[1]Plaintiff lost her license at age 18 due to DUI, never regained it, and had at least two DUI's since that time.

Plaintiff first saw Dr. Sarita Bennett, DO on December 9, 2003, for complaints of extreme fatigue, low motivation, nausea, and sleep dysfunction (referred to as "flu-like symptoms") (R. 72).

On February 10, 2004, Plaintiff told Dr. Bennett she had tested positive for Hepatitis C and would like to start treatment (R. 187). She had no insurance. She was crying. Dr. Bennett diagnosed hepatitis C and "stress reaction" and prescribed Xanax. Plaintiff's alleged onset date is January 9, 2004.

On February 23, 2004, Plaintiff told Dr. Bennett she needed a copy of her labs to take to the state DHHR (R. 185). She also wanted to discuss "help with emotional ups and downs." She said she did not want to go out, and was crying a lot. She was out of Xanax and was not sleeping well. She denied suicidal ideation. She was not working and had told only her mother about her hepatitis diagnosis. Dr. Bennett diagnosed depression and started Plaintiff on Paxil and Xanax for anxiety and depression.

On February 26, 2004, the State DHHR requested information from Dr. Bennett regarding Plaintiff (R. 184). Dr. Bennett stated Plaintiff had diagnoses of hepatitis C and depression and her prognosis was "fair." Her incapacity was expected to last a lifetime, because she would need treatment that may result in loss of work time due to reactions and side effects of medications.

On March 3, 2004, Plaintiff presented to Dr. Bou-Abboud, M.D. for follow-up of her recent diagnosis of Hepatitis C (R. 245) . She had received no prior workup for this. She was interested in starting treatment. She was noted as having a "history of depression," "cry a lot if not taking her pills, has had some suicidal ideation before Rx. Is not under the care of any psychiatrist." Plaintiff stated that she smoked for the past 24 years, drank about a "7pk" of beer every other weekend, used cocaine more than five years ago, and used marijuana on a recreational basis. She was told she

4

needed to discontinue all alcohol.

Plaintiff first filed her application for SSI on April 6, 2004. As already noted, there was no initial or reconsideration determination following this application.

That same date (April 6), Plaintiff saw Dr. Bennett, stating she had applied for a medical card (R. 183). She was taking Xanax and Paxil. Her last alcohol use was one week earlier. She was cheerful and had a new haircut. She made good eye contact. She was diagnosed with hepatitis C– quit alcohol--, and depression, and was referred to Seneca Mental Health for a psychological evaluation.

On April 12, 2004, Plaintiff presented to Seneca Mental Health Services for an initial treatment plan (R. 212). She complained of symptoms including suicidal ideation with no plan or intent, and experiencing symptoms of anger, withdrawal, depression, guilt, anxiety, hopelessness, apathy, agitation, fatigue, poor appetite, poor sleep, and loss of interest in activities. Upon mental status exam, Plaintiff was fully alert and oriented. She was neat and appropriately dressed. She was cooperative and relaxed. Her facial expression, body movements and speech were within normal limits. She was tearful throughout the interview. Her affect was flat and mood depressed. She reported mild suicidal ideations with no plan or intent. She denied any hallucinations and her insight and judgment appeared intact. She had no memory deficits or somatic complaints other than her concern over her new diagnosis of Hepatitis C. She was diagnosed with depression with symptoms of depressed affect and mood. Plaintiff told the evaluator she had had no learning disabilities in school, she had a GED, and, although currently unemployed, had been regularly employed. She said she had a history of drug and alcohol abuse/dependence but had been clean for the last 7 or 8 years.

On April 27, 2004, Plaintiff saw psychiatrist Dr. Eitel at Seneca Services (R. 201). She told

him she had been anxious and depressed since she first learned she had Hepatitis C. She was afraid of needles and was worrying about the treatment. She wondered where she had gotten it. She had no other illnesses. She also complained of irritability, not getting along with people, and avoiding others. She was using Paxil and Xanax but did not feel the Paxil was providing additional benefit. Plaintiff said she drank over the last weekend when she learned her son was put in a boys' school after some aggressive statements.[2] She denied illicit drugs, but in reading her intake, the psychiatrist found she had a history of drug and alcohol dependence but had been clean for seven or eight years. Dr. Eitel diagnosed major depressive disorder, moderate, and history of alcohol abuse in partial remission, and assessed her GAF as 60.[3,4]

On May 4, 2004, Dr. Eitel noted that Plaintiff had been taking increased Paxil and Neurontin. Plaintiff worried that the Neurontin would make her gain weight, as she had recently lost some weight and did not want to regain it (R. 200). Dr. Eitel told her many people did not gain weight on Neurontin. She was not sure if there were any changes but admitted she had not gotten in any arguments or been irritable the past week. Plaintiff was noted to be casually dressed; friendly and soft-spoken; alert and oriented; with intact insight and judgment and no signs of psychotic thinking.

---

[2]Plaintiff did not have custody of any of her children.

[3]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

[4]A GAF of 61 to 70 indicates **Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.** Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

Dr. Eitel still diagnosed major depressive disorder, moderate, and history of alcohol abuse in partial remission.

On June 1, 2004, Plaintiff saw Dr. Bennett with complaints of not being able to sleep and back pain (R. 181). She was "currently in jail due to 'drug charges from Virginia in 2001,'" and had been incarcerated for eight days. She also needed a follow up for her hepatitis C and new glasses. The doctor diagnosed Hepatitis C, depression and anxiety.

On July 1, 2004, Plaintiff presented to Dr. Bennett for a physical for the DDS (R. 176). She had recently been diagnosed with hepatitis C, with a longstanding history of alcohol abuse currently in remission. The doctor noted Plaintiff had depression and generalized anxiety controlled with medication. The doctor checked everything off as normal except for Plaintiff's vision and her mental status of "Depression/anxiety." Her medications were paxil, neurontin, and Xanax, for hepatitis C, major depression, and generalized anxiety disorder. It was also noted that same day that Plaintiff had been incarcerated and had not been allowed to have Xanax while in jail. Nevertheless, her depression was listed as stable and her anxiety listed as stable on Xanax.

On July 26, 2004, Plaintiff presented to RN Kathy Whitney for follow up of her diagnosis of hepatitis (R. 141). She stated she had been stable, and had been to a psychiatrist and optometrist. She was feeling OK and not having any problems. She was thinking about quitting Neurontin because she was gaining weight, and got more depressed when she gained weight. She drank alcohol twice in the last few weeks and was going to AA meetings twice a week . Her major problems were noted to be hepatitis C, Depression, Anxiety disorder, GERD, Diarrhea, and alcohol use. The nurse noted that Plaintiff was "continuing to drink alcohol, although in moderation. Asymptomatic with Hep C at this time."

On August 4, 2004, Plaintiff presented to Dr. Charles Bou-Abboud for a liver biopsy. The diagnosis was hepatitis C (R. 138).

On August 10, 2004, Plaintiff presented to Dr. Eitel for follow up (R. 198). She said she had been in jail for violating her probation[5] by crossing the state border. She continued to deal with her Hepatitis C, learning she may have gotten the disease through a tattoo. She admitted being anxious and having some bad days but felt improved since being on Paxil. She was concerned about gaining 20 pounds on Neurontin, however, which she said made her irritable and hungry. She felt she had not been as irritable toward people "but laughs and states that others might have a different idea." She said she had been clean of drugs and alcohol for seven or eight years but admitted recently drinking three beers "during Pioneer Days." Upon mental status exam, Plaintiff was friendly and "less anxious than I have seen before." Speech was normal. She denied depressed mood. Her affect was full and there was no evidence of psychosis. She was alert and oriented and her insight and judgment were fair to good and intact. She had no suicidal thoughts. Dr. Eitel diagnosed major depressive disorder, recurrent, mild, and alcohol abuse in partial remission. Her GAF was now listed as 65 ("some mild symptoms").

On August 16, 2004, Plaintiff presented to Nurse June Pendy for follow up for results of labs and liver biopsy (R. 136). She remained stable on her therapy. She had no problems with the biopsy and did not want to start meds at the time because she was going on vacation and wanted to wait a week. She reported feeling good, with good appetite and energy levels. She was diagnosed with chronic hepatitis Grade I. She reported having had no alcohol since one month earlier. Seneca

_____

[5]The undersigned notes the original application, dated April 6, 2003, in which it was stated that Plaintiff was not on federal or state parole or probation since February 2003.

Health informed the doctor that Plaintiff had depression "under relatively good control." She was diagnosed with hepatitis, C, depression, anxiety disorder, GERD, diarrhea, and alcohol use.

The amendment to the original application, changing Plaintiff's parole/probation/fugitive status, as noted above, was dated August 17, 2004.

On August 25, 2004, Plaintiff presented to LPN Kathy Whitney for follow up in reference to her Hepatitis C. It was noted she was stable on the current therapy, but had a new problem because she had "violated her probation and might to go jail for a six months period of time" (R. 135). Her major problems were listed as hepatitis C, major depressive disorder, GERD, diarrhea, and alcohol use.

There do not appear to be any records from August 25, 2004, until August 2, 2005. Plaintiff was in jail from August 2004, until sometime in June 2005. Plaintiff's current application for SSI was filed on July 25, 2005, still with an alleged onset date of January 9, 2004.

On August 2, 2005, Plaintiff presented to Dr. Bennett for a State DHHR Physical Exam (R. 173). She had last seen Dr. Bennett over a year earlier, also for a disability exam. Dr. Bennett noted Plaintiff was "not under a doctor's care." Plaintiff's complaints were of being "on parole," "very depressed," not sleeping well, and migraines with vomiting. She smoked a half pack of cigarettes per day. Plaintiff stated her incapacity was that she was "unable to deal with people due to severe depression; has hepatitis C." Her height was 5'4" and her weight was 243. After examination, Dr. Bennett checked everything as "normal" except for psychiatric, which listed "Depressed." The diagnosis was major depression and Hepatitis C, with migraines and asthma as minor diagnoses. The doctor stated that Plaintiff was unable to work full time at her customary occupation or like work because "Depressed mood results in inability to function." The duration of the "disability"

would depend on her response to treatment. The doctor diagnosed depression and started her on Paxil; migraines, and started her on Topamax; anxiety on Xanax; asthma on Advair; and hepatitis C.

In Plaintiff's Function Report, dated August 8, 2005, Plaintiff stated her disability as severe depression, anxiety, hepatitis C, and panic attacks (R. 100).

On August 15, 2005, Plaintiff presented to Dr. Eitel for follow up. She had last seen Dr. Eitel over a year earlier. She informed him she had been released from jail in June 2005 after violating her probation. She had been off her medication for the past month. She hadn't found much benefit from Paxil. She had poor sleep, irritability and low mood, and wanted to get back on her medication. Plaintiff said she was trying to maintain contact with her probation officer and her doctor's appointments, and admitted "there is no time to find a job." Her mood was irritable, her speech regular, her attitude cooperative and appropriate, and her thought processes connected and presented in a logical manner. She was fully alert and oriented. Her attention was satisfactory and her insight and judgment were intact. Dr. Eitel found Plaintiff's mood irritable but her affect full, and concluded her mental status was normal. He diagnosed mood disorder NOS and Alcohol Abuse in Full Sustained Remission with a GAF of 60. He started her on Seroquel for help with sleep and mood.

In a subsequent report, Dr. Eitel noted he had reviewed Plaintiff's therapy notes, including one from August 2005, which the undersigned was unable to locate in the record. Dr. Eitel, however, described the report as stating that

> [Plaintiff] reported anger toward other people involved defendants [sic] who she
> believed were getting more favorable treatment. She was frustrated that she could
> not find employment and had financial difficulties. She admitted that she was driven
> to drink alcohol. The therapist encouraged her to continue her abstinence, but she

allegedly had limited responsiveness to this particular discussion. She was noted to be oriented and her memory was intact. Her insight was incomplete. Her judgement was fair. She chose to focus on other people and to display her anger and frustration with her situation.

(R. 283-284).

On August 20, 2005, a State agency reviewer completed a Physical Residual Functional Capacity Assessment, finding Plaintiff could lift 50 pounds occasionally, 25 pounds frequently, could stand/walk about six hours in an eight-hour workday, and could sit about six hours in an eight-hour workday (R. 148). She could only occasionally balance, but could perform all other posturals frequently. She should avoid concentrated exposure to extreme cold and fumes, odors, dusts, gases and poor ventilation.

The State reviewer stated that Plaintiff had physical problems of a severe nature, but they did not cause a lot of functional restrictions. She should be capable of medium work. She may experience some fatigue due to the hepatitis C and her asthma would restrict fumes, dusts, and odors, but she did not express a lot of physical limitations of activities of daily living ("ADL's").

On September 1, 2005, Plaintiff reported to Dr. Bennett that she would "break down and cry," and that she was performing community service at the town office (R. 268). She was on Seroquel for the past 2 ½ weeks. Plaintiff did not yet have a medical card. Dr. Bennett diagnosed depression, for which she prescribed Lexapro or Paxil, and anxiety, for which she prescribed ½ a Xanax tablet at 9 a.m.

On September 2, 2005, Plaintiff saw Julia Hanna, a Physician's Assistant in Dr. Eitel's office (R. 195). Plaintiff wanted to try Lexapro for help with her anxiety and depression. Her mood was euthymic and mental status exam was normal. She was diagnosed with a mood disorder NOS and alcohol abuse in full remission.

11

On October 18, 2005, Plaintiff saw Dr. Eitel for follow up (R. 194). She reported good stability in her medication. She was sleeping well and her anxiety and irritability and mood were under good control. Her mood was euthymic and her mental status exam was normal. She was diagnosed with mood disorder NOS and alcohol abuse in full sustained remission.

On October 24, 2005, a State agency psychologist completed a Psychiatric Review Technique ("PRT") opining that Plaintiff had an affective disorder and substance abuse disorder, but neither was severe within the rules (R. 155). He described her affective disorder as a mood disorder NOS, and alcohol abuse in remission. He opined she had no restriction of activities of daily living, no difficulties maintaining concentration, pace or persistence, and only mild difficulties in social functioning. She had had no episodes of decompensation of an extended duration.

On November 2, 2005, Plaintiff presented to Dr. Bennett for removal of skin tags on her neck (R. 170). It was noted she had now had a medical card and was "doing better." She was on Lexapro, Propamax, and Xanax. She was diagnosed with skin tags (excised), GERD on prevacid, and Depression "improved-- continue with Seneca Mental Health."

An Initial Determination finding Plaintiff not disabled was filed on October 31, 2005 (R. 46).

On November 29, 2005, Plaintiff presented to Dr. Eitel for follow up (R. 193). She admitted to worsening depression. She had been doing well on Lexapro but now found herself depressed. She had been sleeping well and was in counseling. Her mood was dysthymic, but her mental status exam was otherwise normal. Her diagnosis remained mood disorder NOS and alcohol abuse in sustained remission. She was to start on Cymbalta for "low mood."

On December 20, 2005, Plaintiff told PA Julia Hanna that she was extremely irritable. She had thrown a pan at her roommate and told him to cook dinner if he wanted to. She noticed

significant irritability and agitation since starting the Cymbalta. She said she did not rest well, sometimes staying up two or three nights and then "crashing." Ms. Hanna noted Plaintiff conversed very well, but seemed quite agitated and very animated when talking about her symptoms. Her thoughts were logical and linear, with no circumstantiality. Ms. Hanna diagnosed bipolar disorder NOS. Ms. Hanna felt that Plaintiff seemed to be "demonstrating significant symptoms of mood lability associated with bipolar disorder," and gave her a prescription for Risperdal.

According to Dr. Eitel's report, in January 2006:

> [Plaintiff] reported that she had not been doing well. Her sleep was difficult. She had separated from her male partner because of his threats toward her. She had poor appetite and frequent crying spells. She acknowledged that she did get drunk shortly after she was threatened. She drank a fifth of whiskey and eventually passed out after becoming ill. She reported that she should not have made the decision to drink and the drinking only complicated the situation. She agreed to evaluate her thought patterns that led her to drink.

(R. 284).

Plaintiff filed an "Appointment of Representative" on January 9, 2006, and filed her Request for Reconsideration on February 2, 2006 (R. 45).

On February 14, 2006, Plaintiff saw Ms. Hanna in Dr. Eitel's office for followup (R. 252). Plaintiff said she had been very sick recently, believing she had pneumonia. She was in bed nearly two weeks with it. She admitted "going off on her boyfriend" again just before getting sick. She beat his car and threatened to hurt him. He called police but nothing came of the domestic altercation. She continued to be irritable and moody. Although her voice was raspy with chest cold symptoms, Plaintiff's mood was euthymic and her affect was full. Her insight was good although judgment was considered "questionable at times." She was diagnosed with bipolar disorder, NOS and alcohol abuse in sustained remission.

Plaintiff filed a Function Report on February 15, 2006, describing her daily activities as follows:

> After I get up in the mornings, I turn on TV. Sometimes eat lunch, follow up with appt's as scheduled. I occasionally cook but most of the time I eat a sandwich for lunch or dinner. I take a shower, make my bed at times, do light house keep [sic] chores such as dishes, dusting, sweeping or vacuuming.

(R. 109). She described her mental problems mostly as lack of interest or lack of concentration (R. 111), stating:

> My mood state and depression has increased my difficulty in concentration making it harder for me to stay on task with most things. I also experience increased fatigue which could be a result of depression or Hep C.

(R. 113). She stated she could pay attention for only 15-20 minutes, and could not follow written instructions well because they had to be "reviewed several times and still have possible freq. mistakes." She stated her ability to follow spoken instructions "varied due to poor concentration." She stated she did not handle stressful situations well and did not handle changes in routine very well, but had no problems getting along with authority figures (R. 115).

On March 9, 2006, State reviewing psychologist Debra Lilly completed a Psychiatric Review Technique ("PRT") finding that Plaintiff had an affective disorder, but that it was not "severe" (R. 215). The affective disorder was listed as a "mood disorder, NOS." Dr. Lilly opined that Plaintiff would have mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace. She had no episodes of decompensation, each of extended duration.

On March 15, 2006, Plaintiff presented to Dr. Bou-Abboud for follow up of her hepatitis C "after a long absence." She had no complaints at the time and was "doing well." She had been overall stable on the current regimen. She was very pleasant and cooperative in interview and

examination. She was well appearing. Dr. Abboud discussed with Plaintiff the length of treatment for hepatitis C.

Denial of Plaintiff's Request of Reconsideration was signed on March 14, 2006 (R. 45).

Plaintiff filed her Request for Hearing by Administrative Law Judge on March 17, 2006 (R. 42).

On March 21, 2006, Plaintiff presented to Dr. Eitel for follow up (R. 251). She said she remained irritable with crying spells. She did not feel her medications were working. Dr. Eitel found Defendant's mood was irritable but her affect was full. Her mental status exam was otherwise normal. Dr. Eitel diagnosed bipolar disorder NOS.

On June 7, 2006, more than six months after her last appointment with Dr. Bennett, Plaintiff saw the doctor for her annual pap smear/physical exam and for migraines (R. 266). There is no mention of depression or anxiety in this, the last report from Dr. Bennett in the record.

On June 13, 2006, Plaintiff presented to Dr. Eitel, complaining of continuing to be quite labile with periods of depression and irritability. She did not feel the Abilify was working. Her mood was irritable and her affect was flattened. Her mental status exam was otherwise normal. She was diagnosed with bipolar disorder NOS. Plaintiff also admitted to her therapist that she drank three beers over the Memorial Day holiday (R. 284). She "had some mild depressive symptoms."

On July 18, 2006, Plaintiff presented to Dr. Eitel for follow up (R. 248). She admitted to still having some low mood and frustration. She said she was not sleeping well and could not tolerate the Topamax. She had been performing her required "Community Service, currently painting a gazebo." She admitted to frustration due to her legal issues and was working on complying with her parole requirements. She was avoiding alcohol and drugs. Her affect was constricted. As to her

mood, she "admits to some irritability, some low mood, and poor sleep." She was diagnosed with mood disorder, NOS and alcohol abuse in full sustained remission with a GAF of 60.

In August 2006, according to Dr. Eitel, Plaintiff "was pleased that she had been able to maintain her sobriety and effectively manage her depression." She said she continued to have some anxiety attacks.

On October 16, 2006, Plaintiff was provided independent therapy at Seneca Health (R. 278). Plaintiff reported a great deal of increased stress and said that she was not managing things as well as she would like. She was abstaining from drugs and alcohol. She said her 19-year-old biological son had come to live with her and it was not going well and she planned to ask him to leave. He had stolen her Xanax. Plaintiff was in a "sad" mood. She had a stable affect and her mental status exam was otherwise normal. She had no specific somatic complaints. The therapist noted Plaintiff had several increased stressors which resulted in her experiencing an increase in her depressive symptoms, but she had managed without alcohol or drugs. She was complying with the rules of probation and was able to recognize, challenge, dispute, and replace irrational thoughts.

On October 30, 2006, Plaintiff reported to Seneca that she had been charged with domestic battery for pulling a knife on her significant other during an argument (R. 280). She was arrested and placed in jail for one week. The charges were later dismissed, she said, after Seneca explained her "situation."

Plaintiff reported the knife incident to her therapist that same date. She believed that she would have her probation revoked by the State of Virginia. She said her medications were not working and she did not want to hear "any of that shit about thinking about something else or doing something else." She also reported that her husband, from whom she had been separated for years,

16

had passed away and she had no information about his death. She said she was having daily panic attacks. She was also in trouble for back child support and had not been able to pay her fines. She had not used alcohol or drugs but "planned to get drunk with her cousin." She blamed her psychiatrist for her being uncontrolled and declined referral to a psychiatric hospital. Upon mental status exam, her mood was "angry" but her affect was stable. She was fully oriented with intact memory. Her insight and judgment were poor. There was no indication or drug or alcohol use and no suicidal or homicidal ideation. She had no specific somatic complaints. The therapist found Plaintiff uncooperative and her resistance to treatment severe.

The therapist opined that Plaintiff demonstrated severe regression since her last contact. Her legal situation was undetermined since she violated the law, which "would probably result in her parole being revoked." In addition she had returned to the home of her significant other. She was planning to drink and was not accepting responsibility for her behavior, blaming the psychiatrist because her medications did not control her. The therapist told her she needed to control herself and not expect the medication to keep her controlled 100 %.

Three months later, on January 18, 2007, Plaintiff saw the therapist for follow up (R. 274). Plaintiff reported "continuing to do well." She was effectively managing her depression. She was clean and sober and continuing to have "minor to moderate" symptoms of depression. She was remaining as active as possible although no longer performing her community service. She continued to live with her significant other and sometimes that situation was very stressful. She stated she was able to ignore the person if he tried to goad her into an emotional response. Upon mental status examination plaintiff was fully oriented, memory was intact, insight was fair to good and judgment continued to be good. She was cooperative and resistance was mild. She had no

specific somatic complaints and complied with her medication with no reported negative side effects.

The therapist found Plaintiff remained stable with effective management of her sobriety and depression. She reported managing her anxiety well using systematic relaxation and ignoring provocation. She was compliant with meds.

On January 23, 2007, Plaintiff presented to PA Hanna for follow up (R. 272). She reported that even after the addition of Wellbutrin she continued to have problems with low energy, stating she slept all the time. She had also been prescribed Klonopin by her regular doctor, and she was afraid of becoming addicted. Her affect was constricted but her mood was euthymic. Her mental status exam was normal. She was diagnosed with mood disorder NOS and alcohol abuse in full sustained remission, with a GAF of 60.

On February 15, 2007, Plaintiff followed up with her therapist (R. 270). Plaintiff stated she was maintaining her sobriety and also was effectively managing her depression and anxiety. She did report continuing to sleep excessively. She believed this was partly due to the weather and when the weather warmed up she would become more active. There was minimal conflict between her and her "friend," but she remained compliant with her parole from Virginia and was making payments on her fines. She was managing her depression and anxiety by changing her thoughts and actions, and using deep breathing and relaxation. She was not craving alcohol. Mental status exam was normal. She was in a good mood with a bright and stable affect. The therapist opined that Plaintiff remained stable as far as depression and anxiety were concerned.

Plaintiff's administrative hearing was scheduled for February 27, 2007 (R. 34).

On February 15, 2007, Dr. Eitel wrote a letter to Plaintiff's counsel regarding her application for SSI (R. 283). Besides reciting most of the plaintiff's history noted above, Dr. Eitel opined:

Based on Ms. Melvin's symptoms, she appears to suffer from bipolar disorder. She also has a history of alcohol dependence which she has generally been able to overcome with minor relapses. She appears to make regular appointments for mental health counseling and medication management.

It would be important to note that much of Ms. Melvin's irritability and legal issues, as well as possible self medication with alcohol, may be social symptoms of bipolar disorder.

(R. 284). Dr. Eitel completed a PRT, based upon an affective disorder. The form states that Plaintiff

had "depressive syndrome characterized by:" 1) appetite disturbance with change in weight; 2) sleep

disturbance; 3) psychomotor agitation or retardation; and 4) difficulty concentrating or thinking; as

well as "Manic syndrome characterized by:" 1) inflated self-esteem; 2) decreased need for sleep; and

3) involvement in activities that have a high probability of painful consequences which are not

recognized. (R. 288). Dr. Eitel did not find that Plaintiff had any substance addiction disorder.

Dr. Eitel then opined that Plaintiff would have mild restriction of activities of daily living,

mild difficulties in maintaining concentration, persistence or pace, and moderate difficulties in

maintaining social functioning (R. 295). He then found she had had four or more repeated episodes

of decompensation, each of extended duration. Based on these findings, Plaintiff would not meet

Listing 12.04B, but Dr. Eitel found she would meet 12.04C, because she had repeated episodes of

decompensation, each of extended duration, and "a residual disease process that has resulted in such

marginal adjustment that even a minimal increase in mental demands or change in the environment

would be predicted to cause the individual to decompensate" (R. 296).

Dr. Eitel also completed a Mental Impairment Questionnaire, finding that Plaintiff had no

limitations on her ability to remember work-like procedures or very short and simple instructions;

no limitation on her ability to remember, understand and carry out simple or detailed instructions;

and no limitation on her ability to maintain attention for extended periods. She would have a

moderately limited ability to maintain regular attendance and be punctual; maintain an ordinary routine without supervision and complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number of rest periods. She would be "markedly limited" in her ability to work in coordination or proximity to others; interact appropriately with the general public; accept instructions and respond to criticism from supervisors; get along with co-workers or peers; and maintain socially appropriate behavior.

At the administrative hearing held on February 27, 2007, counsel for Plaintiff stated that Plaintiff was "trying to do her best . . . with very serious bipolar disorder that is out of control and hepatitis C that cannot be treated because . .. the bipolar is out of control" (R. 316). Plaintiff explained her bipolar condition as follows:

> It's - - I can't - - just sometimes I just - - I don't know what happens. I forget to take my medicine, and then I just go off, and I explode. I get mad at people when people look at me the wrong way. I don't want to hurt them.

(R. 321). She then stated that the medications kept her calm, "but if I forget to take them for a couple of days - - like when I get depressed, when I get really depressed, I don't want to take them, you know." Plaintiff said she spent most of her day (up to 14 hours) sleeping. She said she did not drink at all, and had stopped drinking in 2003.

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

> 1. The claimant has not engaged in substantial gainful activity since January 9, 2004, her alleged onset date (20 CFR 416.920(b) and 416.917 *et seq.*

> 2. The claimant is obese and has a history of Hepatitis C, headaches, and asthma.

This combination is a severe impairment under the regulations (20 CFR § 416.920(c)).

3. The claimant does not have an impairment that meets or is medically equal to one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that there has been no period of twelve consecutive months when the claimant lacked the residual functional capacity for medium work (lift/carry/push/pull 25 pounds frequently and 50 pounds occasionally, stand/walk 6 hours per workday, and sit 6 hours per workday) that did not require more than occasional climbing of ladders, ropes, or scaffolds, and did not expose her to concentrated hazards, vibrations, or respiratory irritants, and that she currently has the residual capacity to work within these parameters.

5. The claimant is capable of performing all of her past relevant work. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).

6. The claimant has not been under a "disability," as defined in the Social Security Act, since July 27, 2005, the date her application was filed (20 CFR 416.920(g)).

(R.14-27).

## IV. The Parties' Contentions

Plaintiff's contentions are as follows:

1.   The ALJ's determination that Ms. Melvin's psychiatric impairment was not severe is not supported by substantial evidence and is in error.

2.   The ALJ failed to follow the required procedure for determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability.

3.   The ALJ had no basis for rejecting the opinions of Ms. Melvin's treating physicians.

Defendant contends:

1.   Substantial evidence supports the ALJ's finding that Plaintiff did not have a severe mental impairment.

2.   The ALJ was not required to perform a drug addiction and alcoholism analysis as

Plaintiff was sober throughout the entire relevant time period in this case.

3.  Substantial evidence supports the ALJ's finding that Drs. Eitel's and Bennett's opinions of disability were not entitled to much weight.

## V. Discussion
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Severe Mental Impairment

Plaintiff first argues that the ALJ's determination that her psychiatric impairment was not severe is not supported by substantial evidence and is in error. Defendant contends substantial evidence supports the ALJ's finding that Plaintiff did not have a severe mental impairment.

The ALJ did find that Plaintiff had an affective disorder and a substance abuse disorder. He

then found that neither was severe. At step two of the sequential evaluation, Plaintiff bears the burden of production and proof that she had a severe impairment. <u>Grant v. Schweiker</u>, 699 F.2d 189, 191 (4th Cir. 1983). To be "severe," an impairment must significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c), 416.920(c). "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b), 416.921(b).

The Fourth Circuit has held that "[A]n impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." <u>Evans v. Heckler</u>, 734 F.2d 1012 (4th Cir. 1984).

Neither party disputes the ALJ's determinations regarding Plaintiff's physical impairments. For reasons set forth below under Heading C, Drug Addiction or Alcoholism, the undersigned finds that Plaintiff's substance abuse disorder (alcoholism) did not significantly limit her ability to do basic work activities, and therefore was not severe. The undersigned further finds that, although Plaintiff's alcoholism may be a medically determinable impairment, it caused no functional limitations during the relevant time frame.

The remaining issue is therefore whether Plaintiff's affective disorder (alternatively diagnosed as depression, mood disorder or bipolar disorder) was more than a "slight abnormality"

that would be "expected to interfere with [her] ability to work."

Plaintiff saw Dr. Eitel in April 2004, stating she had been depressed and anxious since learning she had hepatitis. The diagnosis was major depressive disorder-moderate, and history of alcohol abuse in partial remission with a GAF of 60 (mild to moderate symptoms). One month later, Dr. Eitel found Plaintiff friendly and soft-spoken, alert and oriented, with intact insight and judgment. He still diagnosed major depressive disorder, moderate, and history of alcohol abuse in partial remission. In July 2004, Dr. Bennett performed a physical examination of Plaintiff for the State agency. Dr. Bennett checked off everything on the form as "normal" except for Plaintiff's vision and her mental status of "anxiety/depression." Dr. Bennett noted Plaintiff had been incarcerated for eight days in June due to "drug charges from Virginia," and had not been allowed to have Xanax while in jail. Still Dr. Bennett diagnosed Plaintiff with depression-stable and anxiety-stable on Xanax. In August 2004, after serving time for a probation violation, Plaintiff said she was anxious and had some bad days but felt improved since starting on Paxil She felt she was not as irritable, laughing and joking that "other people might not agree." Dr. Eitel found Plaintiff less anxious than he had seen before (and he had not diagnosed anxiety at the previous visit). Plaintiff denied depression. Her affect was full. Dr. Eitel diagnosed major depressive disorder, recurrent, mild, and assessed her GAF as 65 ("some mild symptoms").

There is no evidence that Plaintiff underwent any treatment or even examination for more than a year after being diagnosed as stable on medications with only some mild symptoms. The undersigned therefore finds substantial evidence that Plaintiff did not have a severe mental impairment that lasted or was expected to last for 12 months or more up until at least August 2005.

When Plaintiff next presented to Dr. Bennett, in August 2005, it was for another examination

24

for the State agency. Plaintiff's complaints were of "being on parole," "very depressed," "not sleeping well," and migraines with vomiting. She stated her incapacity as being "unable to deal with people due to severe depression; has hepatitis C." Dr. Bennett again checked every system as "normal" except for "mental status" beside which she wrote "Depressed." Dr. Bennett then stated that Plaintiff would be unable to work full time at her customary occupation or like work because "Depressed mood results in inability to function." The duration of this inability "would depend on her response to treatment." Again, however, Plaintiff had not been permitted to use Xanax while in prison, and Dr. Bennett opined Plaintiff's depression was stable and her anxiety was stable on Xanax. That same month, Plaintiff also admitted to Dr. Eitel she had been off her medications for a month. She said she had poor sleep, irritability and low mood, and wanted to get back on medication. She said because of complying with probation and appointments, there "was not time to find a job." Dr. Eitel found Plaintiff's mood at this time to be irritable, but her attention was satisfactory, and her affect was full. He found her mental status was normal. He diagnosed a mood disorder and a GAF of 60, and started her on Seroquel for help with sleep and mood.

One month later, Plaintiff reported to Dr. Bennett that she would "break down and cry." Notably, she was performing community service, evidence that she had the ability to perform work. Dr. Bennett diagnosed depression, for which she prescribed Lexapro or Paxil, and anxiety, for which she prescribed ½ a Xanax tablet at 9 a.m. At about the same time, Dr. Eitel found Plaintiff's mood was euthymic and her mental status exam was normal. After another month, Plaintiff reported good stability on her medication. She was sleeping well and her anxiety and irritability and mood were under good control. Her mood was euthymic and her mental status exam was normal.

In November 2005, Plaintiff saw Dr. Bennett for for removal of skin tags on her neck. The

doctor noted Plaintiff now had a medical card and was "doing better." Her depression was "improved." There is not even any mention of anxiety. On June 7, 2006, more than six months after her last appointment with Dr. Bennett, Plaintiff saw the doctor for her annual pap smear/physical exam and for migraines (R. 266). There is no mention of depression or anxiety in this, the last report from Dr. Bennett in the record. Later that same month, however, Plaintiff told Dr. Eitel she "now" "found herself depressed." Her mood was dysthymic but her mental status exam was still otherwise normal. She was started on Cymbalta for "low mood."

In December 2005, Plaintiff told a physician's assistant she was "extremely irritable," stating she had thrown a pan at her roommate and told him to cook dinner himself. She said she stayed up two to three nights before "crashing." The PA noted she seemed "quite agitated and animated" when talking about her symptoms, but still conversed very well, and her thoughts were logical and linear. The PA opined that Plaintiff "seemed to be demonstrating significant symptoms of mood lability associated with bipolar disorder," and prescribed Risperdal. Two months later, Plaintiff again saw the PA, reporting she had "gone off on her boyfriend again," which apparently consisted of breaking a light on his car and "threatening to hurt him." She said she continued to be irritable and moody, yet the PA found her mood euthymic, her affect full, and her insight good. Her judgment was found to be "questionable at times." The PA diagnosed bipolar disorder.

One month later, on March 15, 2006, Plaintiff saw Dr. Eitel, telling him she remained irritable with crying spells. Dr. Eitel found her mood irritable but her affect full. Her mental status exam was again otherwise normal. Dr. Eitel now diagnosed bipolar disorder for the first time. In June 2006, Dr. Eitel found Plaintiff's mood irritable and her affect flattened, although her mental exam otherwise remained normal. He again diagnosed bipolar disorder. In July, however, Plaintiff

admitted to having "some" "low mood and frustration." She admitted the frustration was at least in part "due to her legal issues." She was working on complying with her parole requirements, and was completing her community service painting a town gazebo.

In October 2006, Plaintiff told a therapist she had a "great deal of increased stress" because her 19-year-old son had come to live with her and he had stolen her Xanax. Plaintiff was in a "sad" mood but with a stable affect and a mental status exam otherwise determined to be normal. Two weeks later Plaintiff told the therapist she had been charged with domestic battery for pulling a knife on her boyfriend during an argument. Plaintiff said her medications were not working and that she was having daily panic attacks. She said she was also in trouble for back child support. The therapist found her mood angry, but her affect stable. She was noted to be uncooperative and resistant to treatment. The therapist found she had "severely regressed" since her last contact. Three months after that, however, Plaintiff reported "continuing to do well." The therapist found she was effectively managing her depression and only had "minor to moderate" symptoms. She was fully oriented, her memory was intact, insight was fair to good, and judgment was good. She was cooperative and had no negative side effects from medication. The therapist found Plaintiff "remained stable with effective management of her sobriety and depression." Five days later, Plaintiff reported she had "low energy." Her affect was constricted but her mood was again euthymic. Her mental status exam was normal. She was again diagnosed with a mood disorder with a GAF of 60.

In February 2007, Plaintiff told her therapist she was effectively managing her depression and anxiety. Although she said she was still sleeping excessively, she herself blamed this on the cold, winter weather, stating she would become more active when the weather warmed up. There was

minimal conflict between her and her boyfriend, she was compliant with her parole, she was making

payments on her fines, and she was managing her depression and anxiety by changing her thoughts

and actions and using deep breathing and relaxation. Her mental status exam was normal and her

mood was good with a bright and stable affect. The diagnosis was that she remained stable as far

as anxiety and depression.

The undersigned finds the facts as recited above substantially support the ALJ's

determination that Plaintiff's affective disorder did not significantly limit her ability to do basic work

activities, and was therefore not "severe." 404.1520(c), 416.920(c).

Plaintiff argues, however, that the ALJ's "only basis for rejecting the opinions of her treating

physicians were the PRTs completed by Timothy Sarr, PHD . . .and Debra Lilly, PHD . . . .Neither

of these reviewing psychologists have ever examined Ms. Melvin and their analysis is based on

incomplete records . . . ." The undersigned has addressed the opinions of disability by Dr. Bennett

and Dr. Eitel later in this opinion. As to the reviewing psychologists, 20 CFR § 404.1527(f)(2)(i)

provides:

> Administrative law judges are not bound by any findings made by State agency
> medical or psychological consultants, or other program physicians or psychologists.
> However, State agency medical or psychological consultants, or other program
> physicians or psychologists, are highly qualified physicians and psychologists who
> are also experts in Social Security disability evaluations. Therefore, administrative
> law judges must consider findings of State agency medical or psychological
> consultants, or other program physicians or psychologists, as opinion evidence,
> except for the ultimate determination about whether you are disabled.

The ALJ was therefore required to consider the opinions of Dr. Sarr and Dr. Lilly in making

his determination. Both found that Plaintiff did not have a severe mental impairment. Although

Plaintiff is  is correct in arguing that the complete record was not before the two State agency

psychologists when they submitted their opinions, the ALJ addressed this in his decision. He noted

that additional treatment records were obtained from Seneca Mental Health after the DDS review. He then thoroughly discussed the more recent records, and discussed why they did not alter his determination, as follows:

> The new notes do not differ significantly from those that were before the DDS. When the claimant's GAF was reported in the new notes, it was reported as 60. The new notes do not reflect a major change in the claimant's condition, presentation, or functioning. She continued to exhibit appropriate behavior, attitude and demeanor during sessions. Her thought[s] continued to be logical, forward thinking, and goal directed. Her attention continued to be satisfactory. Her insight and judgment were fair-to-good. Her mood continued to be irritable, but it was reported as irritable in the notes that were before the DDS.

(R. 17-18).

Additionally and more importantly, the ALJ did not base his determination solely upon the DDS opinions, as argued by Plaintiff. He expressly stated that he accorded significant weight to the actual records and notes from Seneca Mental Health.

The ALJ explained the reasoning behind his mental RFC as follows:

> The undersigned adopted the DDS assessments (Exhibits 5F and 10F) because they were consistent with the other credible evidence of record. For the reasons that were identified in the earlier summary and analysis, the undersigned rejects the assessment Drs. Eitel and Bennett provided regarding the impact of the claimant's depression on her ability to work (Exhibit 7F, pages 4, 5 and 15F). The statements were conclusory and were not supported; furthermore, the determination of the claimant's disability status is reserved to the Commissioner of Social Security pursuant to 20 CFR 404.1525(e)(1) and SSR 96-5p. Dr. Bennett did not treat the claimant for depression, but deferred to Seneca for treatment of mental health issues. The claimant's longitudinal record at Seneca, as well as her GAFs at Seneca, indicate that the claimant had mild to barely moderate symptoms. To the extent that she may have occasionally had more than mild symptoms and limitations, it was due to legal or domestic conflicts/problems, and none of these periods lasted for 12 consecutive months.

The ALJ further noted that Plaintiff worked and performed community service in compliance with her probation, and worked around and with others without significant problems.

She apparently was able to work with her probation officer without problems.

Finally, although not necessary to this opinion, the undersigned notes that the ALJ did include restrictions against contact with the public or more than occasional interaction with coworkers in one of his hypotheticals to the VE. The VE testified that even with those additional restrictions, Plaintiff would be able to perform her past job of maid, with at least 425,000 jobs available in the national economy and 14,500 in the regional economy. The ALJ later rejected those limitations and that hypothetical, finding Plaintiff did not have a severe mental impairment. The testimony of the VE, however, is substantial evidence that, even if Plaintiff had a "severe" mental impairment, she would have been able to perform a significant number of jobs available in the national economy.

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff did not have a mental impairment that was severe under the regulations at the relevant time.

### C. Drug Addiction or Alcoholism

Plaintiff next argues that the ALJ failed to follow the required procedure for determining whether drug addiction or alcoholism was a contributing factor material to the determination of disability. Defendant contends that the ALJ was not required to perform a drug addiction and alcoholism analysis because Plaintiff was sober throughout the entire relevant time period in this case.

In 1996, Congress enacted Public Law 104-121 the "Contract with America Advancement Act, ('CAAA' or 'the Act')," the purpose of which was "to discourage alcohol and drug abuse, or at least not to encourage it with a permanent government subsidy." See Ball v. Massanari, 254 F.3d

817 (9th Cir. 2001). The Act provides, in relevant part, that an individual cannot be considered disabled if drug addiction or alcoholism would be "a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. §423(d)(2)(C). When there is medical evidence that the claimant has a drug or alcohol addiction, the administration must consider whether the claimant would be found to be disabled if her alcohol or drug use stopped. See 20 CFR §416.935, which provides:

> (a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

> (b) Process we will follow when we have medial evidence of your drug addiction or alcohol:

>> (1) the key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is **whether we would still find you disabled if you stopped using drugs or alcohol**.

>> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, **would remain if you stopped using drugs or alcohol** and then determine whether any or all of your remaining limitations would be disabling.

(Emphasis added). Thus, the Social Security Administration first makes a disability determination irrespective of substance abuse. Then it considers what limitations, if any, would remain if the claimant "**stopped using drugs or alcohol**." If the claimant's limitations absent substance abuse would not prevent him or her from working, then drug or alcohol addiction is "material to the disability determination and the claimant cannot receive benefits." 20 CFR § 404.1535, 416.935.

In this case, the ALJ found that Plaintiff did have a substance abuse disorder. The statement at issue is as follows:

When the limitations that are attributable to the claimant's addiction are factored out of the analysis, the claimant does not have mental impairments that produce significant work related limitations. Therefore, the DDS mental assessments at Exhibits 6F and 9F are adopted, and the ALJ finds that during any period of sustained sobriety and abstinence from drugs, the claimant does not have a severe mental impairment.

(R. 16). Plaintiff argues:

In this case, the ALJ bypassed the entire process by "factoring out her addiction" in step two of the sequential evaluation and deciding the remaining psychiatric impairments were not severe. (Tr.16). His finding that "during any period of sustained sobriety and abstinence from drugs, the claimant does not have a severe mental impairment" infers [sic] that she does, in fact, have a severe impairment. The regulations do not allow the ALJ to take this short cut in the process. He is required to first evaluate the disability fully considering all the impairments including any drug or alcohol abuse. Only then can he address the question of whether the disability would remain if she stopped using drugs or alcohol.

(Plaintiff's brief at 8).

Plaintiff cites no Fourth Circuit cases, but relies in large part of the Ninth Circuit case Bustamente v. Massari, 262 F.3d 949 (9th Cir. 2001). In Bustamente, the Ninth Circuit held that the ALJ must identify disability under the five-step procedure before conducting the drug abuse and alcoholism analysis to determine whether substance abuse was material to disability.

The undersigned finds that it is not necessary to determine if the ALJ erred in this instance because, even if he did, that error would be harmless. The Regulations clearly state that the ALJ is to determine what limitations would remain **if the claimant stopped using alcohol**. The ALJ in this case did not need to make that determination, because Plaintiff **had** stopped using alcohol, with only a few rare exceptions. The limitations he found were therefore obviously those that remained when she was not using alcohol.

Plaintiff's alleged onset date is January 2004. On March 3, 2004, she told Dr. Abboud she drank about a "7 pk" of beer every other weekend. A few weeks later, she told Dr. Bennett her last

alcohol use had been a week earlier. Dr. Bennett diagnosed her as having "quit alcohol." On April 12, Plaintiff told the intake person at Seneca that she had a history of drug and alcohol abuse/dependence but had been clean for the last 7 or 8 years. On April 27, 2004, Dr. Eitel noted Plaintiff had "a history of drug and alcohol dependence but had been clean for seven or eight years." He diagnosed major depressive disorder, moderate, and "history of alcohol abuse in partial remission." On May 4, 2004, Dr. Eitel again diagnosed major depressive disorder, moderate, and history of alcohol abuse in partial remission. On June 1, 2004, Dr. Bennett did not diagnose any substance abuse disorder. One month later, Dr. Bennett noted that Plaintiff had a longstanding history of alcohol abuse currently in remission. On July 26, 2004, Plaintiff reported she had had alcohol twice in the last few weeks and was going to AA meetings. Still, she was "feeling OK and not having any problems." The nurse noted that Plaintiff was "continuing to drink alcohol, although in moderation."

On August 10, 2004, Plaintiff admitted to recently drinking three beers "during Pioneer Days." Upon mental status exam that day, Plaintiff was friendly and "less anxious than I have seen before." Speech was normal. She denied depressed mood. Her affect was full and there was no evidence of psychosis. She was alert and oriented and her insight and judgment were fair to good and intact. She had no suicidal thoughts. Dr. Eitel diagnosed major depressive disorder, recurrent, mild, and alcohol abuse in partial remission. Her GAF was now listed as 65 ("some mild symptoms"). On August 16, 2004, Plaintiff told her physician she had last used alcohol a month earlier. There are no records for the next year, as apparently Plaintiff was incarcerated, not due to alcohol-related problems, but for violating her probation.

Defendant filed the current application for disability on July 27, 2005. On August 2, 2005,

Dr. Bennett, in her report to Disability, makes no mention of alcohol or drug use. On August 15, 2005, Dr. Eitel diagnosed Plaintiff with Alcohol Abuse in Full Sustained Remission. On September 2, 2005, a Physician's Assistant in Dr. Eitel's office diagnosed Plaintiff with a mood disorder NOS and alcohol abuse in full remission. On October 18, 2005, Dr. Eitel diagnosed mood disorder NOS and alcohol abuse in full sustained remission. On October 24, 2005, the State agency psychologist opined that Plaintiff had an affective disorder and substance abuse disorder, but neither was severe within the rules. On November 2, 2005, Dr. Bennett did not diagnose any substance abuse disorder and did not even mention alcohol use. On November 29, 2005, Dr. Eitel diagnosed mood disorder NOS and alcohol abuse in full sustained remission. One month later there is still no mention of any alcohol use.

According to Dr. Eitel's report, in January 2006, Plaintiff admitted getting drunk "shortly after she was threatened" by her live-in boyfriend. She got ill and then passed out. She told her doctor, however, that she knew she should not have made the decision to drink and that the drinking only complicated the situation. Notably, there had been no mention of alcohol use from July 2004, until this report in January 2006 (1 ½ years), and Plaintiff was consistently diagnosed either with no alcohol abuse disorder or with alcohol abuse "in sustained full remission."

On February 14, 2006, Plaintiff was still diagnosed with alcohol abuse in sustained remission. On March 9, 2006, the State reviewing psychologist did not find Plaintiff had a substance abuse disorder. On March 21, 2006, Dr. Eitel neither mentioned nor diagnosed any alcohol use or disorder.

On June 13, 2006, Plaintiff did admit to drinking three beers over the Memorial Day holiday. On July 18, 2006, Plaintiff told Dr. Eitel she was avoiding alcohol and drugs. She was again

diagnosed with alcohol abuse in full sustained remission. In August 2006, Plaintiff "was pleased that she had been able to maintain her sobriety . . . ." On October 16, 2006, despite "a great deal of increased stress," Plaintiff was abstaining from drugs and alcohol. Her therapist noted Plaintiff had "several increased stressors which resulted in her experiencing an increase in her depressive symptoms but she had managed without alcohol or drugs."

On October 30, 2006, Plaintiff reported to Seneca that she had been charged with domestic battery for pulling a knife on her significant other during an argument (R. 280). She was arrested and placed in jail for one week. Plaintiff reported the knife incident to her therapist that same date. She believed that she would have her probation revoked by the State of Virginia. She said her medications were not working and she did not want to hear "any of that shit about thinking about something else or doing something else." She also reported her husband, from whom she had been separated for years, had passed away and she had no information about his death. She said she was having daily panic attacks. She was also in trouble for back child support and had not been able to pay her fines. Yet she had not used alcohol or drugs, only stating she "planned to get drunk with her cousin." (Emphasis added). Her therapist noted that Plaintiff was "planning to drink," but also found there was no indication ofr drug or alcohol use. There is no evidence that Plaintiff did drink after this visit.

Three months later, on January 18, 2007, Plaintiff reported "continuing to do well." She was clean and sober. She continued to live with the significant other and sometimes that situation was very stressful. Her therapist found Plaintiff remained stable with effective management of her sobriety and depression.

On January 23, 2007, Dr. Eitel's PA again diagnosed Plaintiff with alcohol abuse in full

sustained remission. On February 15, 2007, Plaintiff was maintaining her sobriety. That same date, Dr. Eitel wrote that Plaintiff had "a history of alcohol dependence which she has generally been able to overcome with minor relapses." Dr. Eitel completed a PRT, based upon an affective disorder. He did not find she had any substance addiction disorder.

Based on all of the above, the undersigned finds that, although Plaintiff has been diagnosed with a history of alcohol abuse, the ALJ's determination that it was not a severe impairment is supported by substantial evidence. The record shows Plaintiff drank on three occasions between July 2004 and May 2006. On two occasions, she had "three beers" during a festival-type occasion, and on one she admittedly became drunk after her boyfriend threatened her. Further, because Plaintiff was not drinking (except for on those very few occasions), the ALJ did not need to determine whether she would be disabled "if she stopped using alcohol." She had stopped using alcohol.

The undersigned agrees that the ALJ's finding in this regard is at least confusing and ambiguous. The undersigned could find no Fourth Circuit case directly on point, but finds a case from the Ninth Circuit, subsequent to Bustamente, instructive. In Parra v. Astrue, 481 F.3d 742 (2007), as in this case, the Plaintiff argued that the ALJ had erred "by failing to conduct the full five-step analysis to determine that Parra's cirrhosis was disabling before conducting the DAA Analysis to determine if Parra's alcoholism was material." The Ninth Circuit first cited Bustamante, noting its holding that the ALJ must identify disability under the five-step procedure before conducting the DAA Analysis to determine whether substance abuse was material to disability. The court also noted that the ALJ's finding in this regard was ambiguous. The court ultimately held, however: "Nonetheless, while the ALJ's five-step analysis is not completely clear, we find any error in this regard to be harmless." (Citing Curry v. Sullivan, 925 F.2d 1127 (9th Cir. 1990)(finding that ALJ

error harmless because it did not affect the result).

It is well settled that an ALJ's decision should be affirmed where an error is harmless, if "he would have reached the same conclusion notwithstanding [the] initial error." See Mickles v. Shalala, 29 F.3d 918 (4th Cir. 1994). Even if the ALJ, therefore, erred by failing to determine whether Plaintiff was disabled before determining whether her alcohol abuse was material to that disability, that oversight is of no moment, because there is no evidence that Plaintiff was abusing alcohol during the relevant time.

### D. Treating Physician Opinions

Plaintiff lastly argues that the ALJ had no basis for rejecting the opinions of her treating physicians, Dr. Eitel and Dr. Bennett, regarding her alleged mental impairments. Defendant contends substantial evidence supports the ALJ's finding that Drs. Eitel's and Bennett's opinions of disability were not entitled to much weight.

"Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983). On the other hand, the Fourth Circuit also held, in Craig:

> Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
>> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the]

case record, we will give it controlling weight.

> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

(Emphasis added).

The ALJ accorded little weight to Dr. Bennett's statement that Plaintiff was disabled due to her psychiatric impairment. On July 1, 2004, Dr. Bennett performed a physical examination of Plaintiff for the State agency. Dr. Bennett checked off everything on the form as "normal" except for Plaintiff's vision and her mental status of "anxiety/depression." Dr. Bennett noted Plaintiff had been incarcerated for eight days in June due to "drug charges from Virginia," and had not been allowed to have Xanax while in jail. Still Dr. Bennett diagnosed Plaintiff with depression-stable and anxiety-stable on Xanax. Dr. Bennett also stated Plaintiff was:

> 38 yr old female with recent diagnosis of Hepatitis C. Longstanding hx of alcohol abuse currently in remission. Depression and generalized anxiety controlled with medication.

(R. 176) (Emphasis added). Plaintiff next presented to Dr. Bennett more than a year later for another physical examination for the State agency. Dr. Bennett referred to Plaintiff as "not under a doctor's care." Plaintiff's complaints were of "being on parole," very depressed," "not sleeping well," and migraines with vomiting. She stated her incapacity as being "unable to deal with people due to severe depression; has hepatitis C." Dr. Bennett again checked every system as "normal" except for "mental status" beside which she wrote "Depressed." Dr. Bennett then stated that Plaintiff would be unable to work full time at her customary occupation or like work because "Depressed mood results in inability to function." The duration of this inability "would depend on her response to treatment."

First, the undersigned finds that Dr. Bennett should not be classified as a treating physician at the time of her disability report. She was seeing Plaintiff for a State agency physical examination after Plaintiff reapplied for disability. She had last seen Plaintiff a full year earlier, again for a physical examination for the State agency. Although Dr. Bennett did treat Plaintiff on occasion before the first examination and after the second examination, for everything from skin tags to her hepatitis C, the undersigned finds the August 2005, opinion that Plaintiff was disabled by her depression is simply not "an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell, supra. Even Dr. Bennett herself noted in the report that Plaintiff was "not under a doctor's care."

Second, although Dr. Bennett opined that Plaintiff was disabled at the time, she also found the duration of that disability "would depend on her response to treatment." Significantly, Plaintiff had not been permitted to use Xanax while incarcerated, yet Dr. Bennett diagnosed Plaintiff's depression as stable and her anxiety as stable on Xanax. She then renewed Plaintiff's prescription for Xanax. One month later, Plaintiff reported to Dr. Bennett that she would "break down and cry," and that she was performing community service at the town office (R. 268). She had been on Seroquel for the past 2 ½ weeks for help sleeping. Plaintiff did not yet have a medical card. Dr. Bennett diagnosed depression, for which she prescribed Lexapro or Paxil, and anxiety, for which she prescribed ½ a Xanax tablet at 9 a.m. Plaintiff's next visit with Dr. Bennett was two months later, for removal of skin tags. The doctor noted Plaintiff now had a medical card and was "doing better." Her depression was "improved." There is not even any mention of anxiety. On June 7, 2006, more than six months after her last appointment with Dr. Bennett, Plaintiff saw the doctor for her annual pap smear/physical exam and for migraines (R. 266). There is no mention of depression or anxiety

in this, the last report from Dr. Bennett in the record.

The ALJ fully explained the reasons for according Dr. Bennett's August 2005 opinion that Plaintiff was disabled by depression little weight. The undersigned finds that Dr. Bennett was not a treating physician at the time; even if she was, the opinion that Plaintiff was disabled by depression in August 2005, is not well supported by Dr. Bennett's own office notes or the other evidence of record; and is inconsistent with other substantial evidence in the record. Finally, even if Plaintiff actually was disabled by depression in August 2005, Dr. Bennett found she was doing better only two months later, and did not even mention anxiety or depression a year later. The undersigned therefore finds substantial evidence supports the ALJ according little weight to Dr. Bennett's opinion that Plaintiff was disabled due to depression.

The ALJ also accorded little weight to the PRT and MRFC forms submitted by Dr. Eitel on February 15, 2007. The undersigned does not dispute that Dr. Eitel is Plaintiff's treating psychiatrist for purposes of this decision. The undersigned finds that the ALJ thoroughly explained his reasoning for according little weight to Dr. Eitel's February 2007, opinion that Plaintiff was disabled by her mental impairments. Plaintiff first saw Dr. Eitel in April 2004, stating she had been depressed and anxious since learning she had hepatitis. The diagnosis was major depressive disorder-moderate, and history of alcohol abuse in partial remission with a GAF of 60 (mild to moderate symptoms). One month later, Dr. Eitel found Plaintiff friendly and soft-spoken, alert and oriented, with intact insight and judgment. He still diagnosed major depressive disorder, moderate, and history of alcohol abuse in partial remission. In August 2004, after serving time for a probation violation, Plaintiff said she was anxious and had some bad days but felt improved since starting on Paxil. She felt she was not as irritable, even laughing and joking that "other people might not agree." Dr. Eitel found

Plaintiff less anxious than he had seen before (and he had not diagnosed anxiety at the previous visit). Plaintiff denied depression. Her affect was full. Dr. Eitel diagnosed major depressive disorder, recurrent, mild, and assessed her GAF as 65 ("some mild symptoms").

On August 15, 2005, a year after her last visit to Dr. Eitel Plaintiff admitted to him that she had been off her medications for a month. She said she had poor sleep, irritability and low mood, and wanted to get back on medication. She said because of complying with probation and appointments, there "was not time to find a job." Dr. Eitel found Plaintiff's mood at this time to be irritable, but her attention was satisfactory, and her affect was full. He found her mental status was normal. He diagnosed a mood disorder and a GAF of 60, and started her on Seroquel for help with sleep and mood. One month later, Plaintiff's mood was euthymic and her mental status exam was normal. She was diagnosed with a mood disorder. After another month, Plaintiff reported good stability on her medication. She was sleeping well and her anxiety and irritability and mood were under good control. Her mood was euthymic and her mental status exam was normal. She was again diagnosed with a mood disorder.

On November 29, 2005, Plaintiff "now found herself depressed." Her mood was dysthymic but her mental status exam was still otherwise normal. Her diagnosis remained mood disorder, and she was started on Cymbalta for "low mood." One month later, Plaintiff told a physician's assistant she was "extremely irritable," stating she had thrown a pan at her roommate and told him to cook dinner himself. She said she stayed up two to three nights before "crashing." She seemed "quite agitated and animated" when talking about her symptoms, but the PA noted she still conversed very well, and her thoughts were logical and linear. The PA opined that Plaintiff "seemed to be demonstrating significant symptoms of mood lability associated with bipolar disorder," and

41

prescribed Risperdal. Two months later, Plaintiff again saw the PA, reporting she had "gone off on her boyfriend again," which consisted of beating his car and "threatening to hurt him." She continued to be irritable and moody, yet the PA found her mood euthymic, her affect full, and her insight good. Her judgment was found to be "questionable at times." The PA diagnosed bipolar disorder.

One month later, on March 15, 2006, Plaintiff saw Dr. Eitel, stating she remained irritable with crying spells. Dr. Eitel fond her mood irritable but her affect was full. Her mental status exam was otherwise normal. Dr. Eitel now diagnosed bipolar disorder. In June 2006, Dr. Eitel found Plaintiff's mood irritable and her affect flattened, although her mental exam otherwise remained normal. He again diagnosed bipolar disorder. In July, however, Plaintiff reported having "some low mood and frustration." She admitted the frustration was at least in part "due to her legal issues." She was working on complying with her parole requirements, and was completing her community service by painting a town gazebo. Dr. Eitel went back to his diagnosis of mood disorder with a GAF of 60.

In October 2006, Plaintiff told a therapist she had a "great deal of increased stress" because her 19-year-old son had come to live with her. It was not going well-- he had stolen her Xanax. Plaintiff was in a "sad" mood but with a stable affect and a mental status exam otherwise determined to be normal. Two weeks later Plaintiff told the therapist she had been charged with domestic battery for pulling a knife on her boyfriend during an argument. Plaintiff said her medications were not working and that she was having daily panic attacks. She said she was also in trouble for back child support. The therapist found her mood angry, but her affect stable. She was noted to be uncooperative and resistant to treatment. The therapist found she had "severely regressed" since her

last contact. Three months after that, however, Plaintiff reported "continuing to do well." The therapist found she was effectively managing her depression and only had "minor to moderate" symptoms. She was fully oriented, her memory was intact, insight was fair to good, and judgment was good. She was cooperative and had no negative side effects from medication. The therapist found Plaintiff "remained stable with effective management of her sobriety and depression." Five days later, Plaintiff reported she had "low energy." Her affect was constricted but her mood was again euthymic. Her mental status exam was normal She was again diagnosed with a mood disorder with a GAF of 60.

On February 15, 2007, Plaintiff told her therapist she was effectively managing her depression and anxiety. Although she said she was still sleeping excessively, she herself blamed this on the cold, winter weather, stating she would become more active when the weather warmed up. There was minimal conflict between her and her boyfriend, she was compliant with her parole, she was making payments on her fines, and she was managing her depression and anxiety by changing her thoughts and actions and using deep breathing and relaxation. Her mental status exam was normal and her mood was good with a bright and stable affect. The diagnosis was that she remained stable as far as anxiety and depression. That very same day Dr. Eitel wrote the opinion at issue. He opined that Plaintiff "appeared" to suffer from bipolar disorder, and her irritability and legal issues and "self-medication with alcohol" "may be" symptoms of bipolar disorder. Dr. Eitel completed a PRT opining that Plaintiff had <u>mild</u> restriction of activities of daily living, <u>moderate</u> difficulties in maintaining social functioning, and <u>mild</u> difficulties in maintaining concentration, persistence or pace. Despite these minimal findings, he then found Plaintiff had had "four or more repeated episodes of decompensation, each of extended duration." Under the findings for Listing 12.04C, he

43

then again found Plaintiff had "Repeated episodes of decompensation, each of extended duration," as well as "A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate."

20 CFR Pt. 404, Subpt. P, App. 1, 12.00 4 provides, in pertinent part:

The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks . . . .

The undersigned agrees with the ALJ that Dr. Eitel's and the other mental health providers' own records do not support an opinion that Plaintiff had "repeated episodes of decompensation, each of extended duration." Nowhere in the record did Dr. Eitel identify the four (or "repeated") episodes of decompensation or the duration of each. The undersigned's independent review of the record does not find support for the conclusory opinion of Dr. Eitel with respect to "episodes of decompensation." Instead, the undersigned finds: 1) Plaintiff was originally depressed and anxious over her hepatitis diagnosis; 2) Eight months later, she was incarcerated for violating her probation by quitting her job and leaving Virginia to move to West Virginia, without permission from, or notification to her probation officer. Her GAF was 65 and she was diagnosed with mild depression; 3) She later apparently violated her probation again, and was incarcerated again; 4) After her release, she was very depressed with being on parole; 5) More than a year later, she threw a pan at her boyfriend, telling him to cook dinner if he wanted; 6) Two months after that, she broke her boyfriend's headlight and "threatened to hurt him;" and 7) Eight months after that incident, she "pulled a knife" on her boyfriend. Even if each and every one of these incidents was an "episode of decompensation" (and the undersigned does not so find), the evidence does not support an opinion

44

that they were "repeated" or were each of "extended duration," according to the definitions in the Regulations. There is no support in the record for a finding that they amount to anything more than individual situational events of short duration– outbursts, if you will.

The ALJ also gave little weight to Dr. Eitel's MRFC, which indicated Plaintiff would be "markedly limited" in her ability to work in coordination or proximity to others; interact appropriately with the general public; accept instructions and respond to criticism from supervisors; get along with co-workers or peers; and maintain socially appropriate behavior. As the ALJ explained, there is no evidence Plaintiff had any problems working and interacting with others or maintaining socially appropriate behavior, except with her boyfriend. Plaintiff herself stated in a disability form that she had no problems getting along with authority figures. She herself described her mental problems in February 2006, mostly as a lack of interest or a lack of concentration. As the ALJ noted, Dr. Eitel consistently assessed Plaintiff's GAF as 60, and even 65, indicating either "mild" or barely "moderate" difficulty in occupational, social or school functioning. Even Dr. Eitel's own PRT, completed the same day, indicated that Plaintiff would have only mild restriction of activities of daily living, only moderate difficulties in maintaining social functioning, and only mild difficulties in maintaining concentration, persistence or pace. As the ALJ found, it is difficult if not impossible to equate these findings, many made over the course of treatment and others made the same day as the RFC, with a person who is markedly limited in her ability to work in coordination or proximity to others; interact appropriately with the general public; accept instructions and respond to criticism from supervisors; get along with co-workers or peers; and maintain socially appropriate behavior.

The undersigned finds Dr. Eitel's opinion of February 15, 2007, is therefore "not supported

by clinical evidence [and] is inconsistent with other substantial evidence, [and ] should be accorded significantly less weight." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996).

The undersigned finds substantial evidence supports the ALJ's according of little weight to the opinions of Dr. Eitel and Dr. Bennett stating that Plaintiff was disabled by her mental impairments. The undersigned has already addressed the ALJ's analysis of the State agency reviewing psychologists' opinions, and found he properly considered those opinions. Further, as the undersigned has also already found, the ALJ did not, as argued by Plaintiff, rely solely on the DDS opinions. He also accorded "significant weight" to the actual records and notes from Seneca Mental Health, which, as described above, do not support a finding of disability due to a severe mental impairment.

The undersigned finds substantial evidence also supports the ALJ's determination that "[t]o the extent that she may have occasionally had more than mild symptoms and limitations, it was due to legal or domestic conflicts/problems, and none of these periods lasted for 12 consecutive months."

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's conclusion that Plaintiff has not been under a disability, as defined in the Social Security Act, since July 27, 2005, the date her application was filed.

## VI. Recommendation

For the reasons herein stated, I find that substantial evidence supports the Commissioner's decision denying Plaintiff's application for SSI, and I accordingly recommend that Defendant's Motion for Summary Judgment [D.E. 12] be **GRANTED**, that Plaintiff's Motion for Judgment on the Pleadings [D.E. 10] be **DENIED**, and that this matter be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and

Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 2/ day of October , 2008.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE